Argued December 18, 1894; decided February 11, 1895.

## BOWMAN *v.* METZGER.

[39 Pac. 3.]

1. PROMISSORY NOTE—GOOD FAITH OF PURCHASER OF NOTE AS AFFECTED BY SUSPICIOUS CIRCUMSTANCES.—A purchaser for a valuable consideration, before maturity, of a negotiable promissory note, is not, as a matter of law, affected by notice of facts calculated to arouse suspicion as to the transaction in which the note was given. The single question involved is whether he acted in good faith, and to aid in determining that question his knowledge or lack of knowledge of suspicious circumstances may be shown.

2. EVIDENCE OF BAD FAITH IN PURCHASING NOTE.—Knowledge by the purchaser of a negotiable note of suspicious circumstances connected with other notes in the hands of his vendor, and of such vendor's peculiar business methods, are proper to be considered by the jury on the issue of good faith in making the purchase.

3. WAIVER OF SUFFICIENCY OF NOTICE OF APPEAL.—Accepting service of a notice of appeal, and stipulating for additional time to file the transcript, will, after the time for appealing has expired, be considered a waiver of the objection that the judgment appealed from was not technically described in the notice.

APPEAL from Multnomah: E. D. SHATTUCK, Judge.

This is an action by B. H. Bowman against J. H. and Eliza Metzger to recover upon three promissory notes for one thousand dollars each, all bearing date August eighteenth, eighteen hundred and ninety-one. On July twenty-ninth, eighteen hundred and eighty-nine, one Ezra Durand, president of a certain corporation known as the

Durand Organ and Piano Company of Portland, Oregon, pretending to act in behalf of said corporation, entered into an arrangement with the defendant J. H. Metzger whereby he transferred and assigned to him twenty shares of the capital stock of said company, in consideration of the defendants' two promissory notes for one thousand dollars each, payable to said company one year after date, with interest from maturity at ten per cent. per annum. At the same time, and as part of the same transaction, Durand delivered to Metzger the following agreement in writing, to wit:—

"PORTLAND, OREGON, July 29, 1889.

"This is to certify that we, the Durand Organ and Piano Company of Portland, Oregon, have this day received of John Metzger his promissory note for the sum of two thousand dollars, to run for twelve months without interest, in full payment for twenty shares of our capital stock, containing one hundred dollars each. We hereby agree annually to renew said note for the term of five years from this date without interest each time of renewal, and we further agree to surrender said note canceled to said John Metzger at the end of five years, for which we hereby agree to renew said note, upon the return and delivery to us of all the twenty shares of capital stock for which it was given; and we further agree to pay a dividend of ten per cent. per annum to the holder of said twenty shares of stock herein described, either in capital stock, or apply the same in payment of the note given for said shares of stock, as the holder may desire. All taxes on capital stock to be paid by the company.

"DURAND ORGAN AND PIANO COMPANY,
[L. S.]                "By E. DURAND, President.
"Attest: D. J. DURAND, Secretary."

On August twenty-first, eighteen hundred and eighty-nine, Durand had a like transaction with one Margaret Metzger, whereby she was induced to execute her note to the said company for one thousand dollars, with like terms and conditions except that she received only ten shares of capital stock. On August twenty-first, eighteen hundred and ninety, these notes were renewed for one year, at the instance of Durand, who had them made payable to himself instead of the company. The defendants, assuming the obligations of Margaret, then deceased, executed all three of the new notes. On November fourth, eighteen hundred and ninety, the First National Bank of East Portland, of which plaintiff was the cashier, became the owner of one of these notes. On August eighteenth, eighteen hundred and ninety-one, at the instance of Durand, these three notes were again renewed by defendants for one year, with like conditions as before. On August twenty-fifth, eighteen hundred and ninety-one, the bank purchased two of these notes of Durand, in consideration of which it returned to him the note previously purchased, and paid him in addition the sum of seven hundred dollars; and on September sixteenth, eighteen hundred and ninety-one, the bank purchased the remaining note, paying therefor eight hundred and fifty dollars. Plaintiff purchased all three of these notes of the bank in the month of July, eighteen hundred and ninety-two, for three thousand dollars. Evidence was offered at the trial which tended to show that on the sixth or seventh day of August, eighteen hundred and ninety-one, Metzger called at the bank and inquired of Bowman about the note then in the bank, concerning which he had been notified, and that he then informed him (Bowman) of the nature of the transaction between himself and Durand. "The agreement was between Durand and us," Metzger testi-

27 OR.—4.

fied, "that these notes should not go out of his hands. He gave us a contract to renew these notes for five years. He was to return them without costs. I also told Bowman that Durand told us he wanted these notes as assets, so he could swear and prove that he had so much security in his possession to secure a company back east for pianos to stock his store, and as fast as he sold these organs and pianos, and got the money for them, he would pay for them."

S. E. Paddock, being called as a witness for plaintiff, testified: "I had some of those notes out, and about the eighth day of July, eighteen hundred and ninety-one, in the evening after the bank was closed I went there to see him (Bowman) in regard to his having an interest in the business, and asked him if he had any stock in this company. He said he had not. I asked him if he ever had, and he said he never had. And he looked at me a moment or so, and asked me if my name was Paddock and I said it was. 'You live out near the slough,' and I says 'Yes'; and he called me to the window on the left, as you go in there from Union Avenue to the bank, and took out five notes and handed them to me. I looked at him, and told him then what the understanding between Durand and myself was in regard to these notes; that they were never to go out of his safe, never to be transferred — no money should ever be paid on them. * * * I told him I understood Durand's object was these notes were to show to manufacturers in the east, in case he wanted to buy goods on time,— to show his standing in the community,— how he was,— the manner his business stood there." J. P. Wilson testified to having discussed with Bowman in July, eighteen hundred and ninety-one, the method employed by Durand for obtaining notes, and to having asked his advice touching the taking of stock therein, and that Bowman advised him that he "probably

better not." The testimony of both these witnesses was admitted over objections.

The court instructed the jury, among other things, as follows: "Where something less than actual knowledge is sought to be used as notice, and as equivalent to knowledge, the transaction ought to be one where the party is put upon inquiry, receives knowledge from some source that is reliable, some imperfection, some defect, some defense to these notes. No mere rumor, no mere casual suggestion concerning it would be sufficient. It must be something that a prudent man would take notice of and inquire about. If a man seeking some advantage of another should be put upon inquiry, and with fair evidence of the truth of some rumor that is abroad, should purposely avoid making inquiry, lest it should interfere with some scheme he had, and he refused to inquire, a man under such circumstances would be held chargeable with the truth of what was in the rumor as much as if he had actual knowledge, provided the circumstances be such that if he made the inquiry he would certainly ascertain the truth." The verdict and judgment was for plaintiff in the sum of one thousand one hundred and forty-five dollars and twenty-nine cents and three hundred dollars attorney's fees, but being dissatisfied with the amount awarded, he appeals.                                          REVERSED.

For appellant there was a brief and an oral argument by *Messrs. William Wallace Thayer* and *Emmet B. Williams.*

For respondents there was a brief by *Messrs. Davis, Gantenbein and Veazie,* and an oral argument by *Mr. James N. Davis.*

Opinion by MR. JUSTICE WOLVERTON.

Two questions arise upon this record; one relates to

the instructions of the court to the jury, and the other to
the admissibility of the testimony of witnesses S. E. Pad-
dock and J. P. Wilson.   Of these in their order.

1.   It is settled law that where a party takes a nego-
tiable promissory note before maturity, for a valuable
consideration, in good faith, and without knowledge of
any defect of title, he acquires a title valid against all the
world.   Four things must concur to give him a good and
valid title.   He must have acquired before due; he must
have acted in good faith; must have purchased without
knowledge of any defect of title; and have paid a valuable
consideration therefor: *Murray* v. *Lardner*, 69 U. S. (2 Wall.)
121; *Goodman* v. *Simonds*, 61 U. S. (20 How.) 364; *Hotchkiss* v.
*National Bank*, 88 U. S. (21 Wall.) 354.   But the question is
here presented whether anything less than knowledge is
equivalent thereto; that is to say, whether notice of facts
or circumstances of a suspicious character, which a pru-
dent man would observe and inquire into, and which, if
followed up, would lead to a disclosure, and consequently
to knowledge of the real infirmities of the paper sought
to be negotiated, is equivalent to such knowledge.   The
current of judicial authority both in England and the
United States has narrowed the inquiry, and practically
limited it to the single question whether the purchase
had been made in good or bad faith, as one who pur-
chases with knowledge of defects in the title is deemed
guilty of bad faith towards him who has a good defense
against all the world except an innocent purchaser.   If
a person takes paper with knowledge of its defects and
infirmities, he takes *mala fide*.   The one follows the other
as day follows night.   So "the rule may be said to re-
solve itself into a question of honesty or dishonesty,
for guilty knowledge and wilful ignorance alike involve
the result of bad faith": *Murray* v. *Lardner*, 69 U. S. (2
Wall.) 121.   The doctrine is now well established, al-

though it was otherwise maintained in England at an early period for a short time, under the *dicta* of *Gill* v. *Cubitt,* 3 Barn. and C. 466, that the right of a *bona fide* purchaser of negotiable paper, for value, in the usual course of business, cannot be defeated on account of negligence in omitting to make such inquiries as a prudent man would be prompted to make. It is the policy of the law to eliminate from the consideration of the jury the question of common prudence as the measure of good faith, and with it the question of negligence, except in so far as it may be taken as indicative of bad faith. A person having under consideration the purchase of negotiable paper may be less suspicious at one time than another, while the accompanying and attendant circumstances may be similar, and yet ordinarily he may be accounted a prudent man. One person may suspect where another would not, and common prudence may characterize each, and the standard by which the jury may measure prudence may be higher or lower according as their business training has moulded their impressions and ideas. Accordingly, it is held that gross negligence only is not a sufficient answer to the *bona fides* of the purchaser, where he has given consideration for the paper. Gross negligence may be evidence of *mala fides* but it is not the same thing. Where negotiable paper has passed without any proof of bad faith in the purchaser, there is no objection to his title: *Goodman* v. *Harvey,* 4 Ad. and El. 870; *Goodman* v. *Simonds,* 61 U. S. (20 How.) 364; *Murray* v. *Lardner,* 69 U. S. (2 Wall.) 121; *Johnson* v. *Way,* 27 Ohio St. 381; Randolph on Commercial Paper, § 1001; *Lane* v. *Evans,* 49 Iowa, 156; *Edwards* v. *Thomas,* 66 Mo. 483; *Craft's Appeal,* 42 Conn. 146; *Kelly* v. *Whitney,* 45 Wis. 110 (30 Am. Rep. 697); *Belmont Bank* v. *Hoge,* 35 N. Y. 65; *Hotchkiss* v. *National Bank,* 88 U. S. (21 Wall.) 354.

The Ohio case of *Johnson* v. *Way,* 27 Ohio St. 381, is based

upon an instruction so very similar to the one rendered in the case at bar that we direct special attention to it. In *Murray* v. *Lardner,* 69 U. S. (2 Wall.) 121, wherein Mr. Justice SWAYNE ably reviews the leading authorities touching the question under consideration, the objectionable instruction was as follows: "It will be for you, gentlemen of the jury, to say whether the defendant has made out,—as the burden lies upon the defendant,—whether he has made out that he received the paper in good faith, without any notice of the defect of the title; in other words, of the theft from the plaintiff; or whether there were such circumstances of the character which I have described to you as would warrant the inference that there was ground of suspicion, and that he should have made further inquiry as to the character of the paper." In *Lane* v. *Evans,* 49 Iowa, 156, the following instruction to the jury was held erroneous: "If the circumstances attending the purchase of the note were of such a character as necessarily to cast a shade upon the transaction, or to put the plaintiff on inquiry as to such fraud, then you will find for the defendant." And *Lake* v. *Reed,* 29 Iowa, 259 (4 Am. Rep. 209), was reversed upon an instruction rendered as follows: "Although the note may have been procured by fraud perpetrated by the payee of the note, or his agents, yet if plaintiff took the note before maturity in the ordinary course of business, and for a valuable consideration, such fraud would not be available as against plaintiff as a defense, until it is shown that the plaintiff had notice of such fraud, or such facts and circumstances as would have put a reasonable man upon inquiry in relation to the same." So that, in the light of the authorities, the instruction of the court below was erroneous. Fraud is proven in such cases when it is shown that the purchaser had notice or knowledge of defects or infirmities in the title to the paper at the time of

purchase. Knowledge may be imputed either by direct proof or by evidence of a circumstantial nature, the same as any other fact. If a person is grossly negligent in the exercise of common prudence, this is a fact competent to go to the jury as evidence of bad faith, but the jury must pass upon the question whether the purchaser has acted honestly or dishonestly, and not speculate as to his probable diligeuce or negligence: *Belmont Bank* v. *Hoge,* 35 N. Y. 65. The rule is thus established that the usefulness of commercial paper may not be restricted, and yet the party taking it is not relieved from the just obligations of the exercise of good faith.

2. If a person purposely refrains from making inquiry lest he should become possessed of knowledge of infirmities in the title to paper which he is about to purchase, this is a fact to go to the jury touching his good faith in the purchase. Good faith cannot be predicated upon want of knowledge resulting from the evasion of a plain duty. A man cannot shut his eyes to the light of day, and say he is without knowledge that the sun is shining. The jury are the judges whether a person has evaded information readily at his command for the purpose of gaining an advantage under the law relative to the transfer of negotiable instruments; and they have a right to consider such a circumstance, if it exists, in determining the *mala fides* of the holder: *Schumueckle* v. *Waters,* 125 Ind. 269 (25 N. E. 281); *State National Bank* v. *Bennett,* 8 Ind. App. 679 (36 N. E. 551). These considerations make the evidence of the witnesses Paddock and Wilson pertinent to the inquiry, since it has a tendency to impute to the plaintiff knowledge of the real transaction as it took place between Durand and defendant J. H. Metzger. Their testimony is not directed to the particular transaction out of which the notes in question originated, but to similar transactions in which Durand was the chief actor, which

were calculated to apprise plaintiff of Durand's business methods. The knowledge of other transactions of a like peculiar and suspicious nature is a circumstance which might properly be considered by the jury in passing upon the good faith of plaintiff in the purchase of the notes in question: *Goodrich* v. *McDonald,* 77 Mich. 486 (43 N. W. 1020), and *State National Bank* v. *Bennett,* 8 Ind. App. 679 (36 N. E. 551). Inasmuch as the substantial rights of plaintiff were injuriously affected by the instruction referred to, the judgment is reversed, and a new trial ordered. REVERSED.

[Decided December 3, 1894.]

ON MOTION TO DISMISS APPEAL.

Respondents moved to dismiss the appeal for that the notice was uncertain and insufficient.

OVERRULED.

*Mr. James N. Davis,* for the motion.

*Mr. William Wallace Thayer, contra.*

PER CURIAM. 3. Where counsel, without objecting to the sufficiency of the notice of an appeal for a failure to technically describe the judgment appealed from, voluntarily accept service thereof, and afterwards sign a stipulation in this court consenting to an order enlarging the time in which to file the transcript, they cannot, after the time for an appeal has expired, question, on a motion to dismiss, the sufficiency of the notice in the respect alluded to.