Decided April 29, 1895.

## RAYMOND *v.* FLAVEL.[*]

[40 Pac. 158.]

1. RIGHT OF TRIAL BY JURY—STATE CONSTITUTION, ART. I, § 17.—That provision of the Oregon constitution providing that "In all civil cases the right of trial by jury shall remain inviolate" guarantees such right only

*This case was originally decided on July fifth, eighteen hundred and ninety-four, the court being of opinion that on the whole record Flavel was an innocent purchaser. No opinion was filed, however, as some of the members were not able to be present in time to prepare an opinion, owing to the stoppage of traffic by a flood in the Columbia River, and it was again fully argued on rehearing after Judge WOLVERTON succeeded Judge LORD. The present opinion is the final conclusion after an elaborate reargument, and is the only written expression of the court's views.—REPORTER.

| | |
|---|---|
| 27 | 219 |
| 34 | 600 |
| 27 | 219 |
| f35 | 16 |
| 27 | 219 |
| 37 | 521 |
| 27 | 219 |
| 39 | 583 |
| 27 | 219 |
| 41 | 477 |
| 27 | 219 |
| 43 | 390 |
| 27 | 219 |
| f47 | 371 |
| 27 | 219 |
| f48 | 574 |

in those cases in which it was demandable at common law;—it does not in anywise extend the right as it existed before the adoption of the state constitution : *Tribou* v. *Strowbridge*, 7 Or. 156, approved and followed.

2. JURY TRIAL IN EQUITY SUITS UNDER SECTION 396, HILL'S CODE — DISCRETION OF COURT — APPEAL.— Section 396, Hill's Code, which provides that "whenever ( in an equity suit ) it becomes necessary or proper to inquire of any fact by the verdict of a jury, the court may direct a statement thereof, and a jury may be formed to inquire of the same," is merely declaratory of the common-law equitable procedure, and in such suit the submission of a question of fact to a jury is within the sound discretion of the court, an abuse of which is reviewable on appeal.

3. EQUITY PRACTICE — JURY TRIAL — STALE DEMAND.—An equity case will not be reversed because of an arbitrary refusal to refer an issue of fact to a jury, where the plaintiff is pursuing a stale demand, for in such a case it would be the duty of the court to dismiss the complaint regardless of how the jury might find.

4. STATUTE OF LIMITATIONS— ADVERSE POSSESSION BY TRUSTEE— CODE, § 382. — The statute of limitations begins to run, as against a *cestui que trust*, unless he is under some statutory disability, or under influence superinduced by the trustee, from the time that the trustee disavows his trust, and assumes complete ownership of the trust property, treating it in such manner and under such circumstances as to give the *cestui que trust* actual or constructive notice that he has repudiated all trust relations, and if this continues for the statutory period the *cestui que trust* will be barred of his right of possession, and of all claim to and interest in the trust property.

5. TRUSTS— LACHES— EQUITY.— One who gives a deed absolute on its face to secure a loan is guilty of such laches as will prevent a resort to equity to have it declared a mortgage, where he makes no complaint for over thirty years, and does not disturb his daughter, to whom the place is conveyed by the mortgagee, during thirteen years while she is in possession, for fear of disturbing the family relations, and waits until after the property is conveyed to an innocent purchaser who has made valuable improvements on the land, although the parties during all this period lived near each other, and the alleged *cestui que trust* was much of the time an object of public charity.

6. SUSPICIOUS CIRCUMSTANCES NOT EQUIVALENT TO NOTICE— BONA FIDE PURCHASER.— Whether one is or is not a purchaser in good faith is an issue of fact that must be determined from many circumstances, and questions of actual and constructive notice and suspicious circumstances are but incidental thereto ; common prudence, *as it is called, is not a safe criterion* to determine such a question : *Bowman* v. *Metzger*, 27 Or. 23, cited with approval.

7. CONSTRUCTIVE NOTICE BY DEED— BONA FIDE PURCHASER.—A deed of bargain and sale with covenants against the acts of the grantor passes every interest and estate which the grantor then has or may subsequently acquire, (*Taggart* v. *Risley*, 4 Or. 235, cited with approval,) and the fact that

it contains a limited warranty, or is entirely without warranty, does not of itself impute notice of latent or prior equities: *Baker* v. *Woodward*, 12 Or. 3; *American Mortgage Company* v. *Hutchinson*, 19 Or. 334, and *Low* v. *Schaffer*, 24 Or. 239, criticised.*

8. EVIDENCE OF NOTICE TO BONA FIDE PURCHASER.— The fact that a person contemplating the purchase of certain land was told by a third person that if he did so he would have trouble with other persons, and that the person from whom he intended to purchase the land had stolen it, does not affect his rights as a *bona fide* purchaser, since such remarks afford no tangible clew by which the purchaser could discover prior equities.

9. BONA FIDE PURCHASER — BURDEN OF PROOF.— Upon proof of an outstanding equitable title, one who claims to be an innocent purchaser in good faith must plead and prove the union of the legal title with a superior equity arising from paying the purchase price and receiving the conveyance without notice, and with a clear conscience: *Rhodes* v. *McGarry*, 19 Or. 222, cited.

10. NOTICE BY REPUTATION OF OWNERSHIP — CODE, § 776, SUBDIVISION 12.— Hill's Code, § 776, subdivision 12, providing that "a person is presumed to be the owner of land from exercising acts of ownership over it, or from common reputation of his ownership," does not render common reputation as to the ownership of land constructive notice of the reputed owner's title to persons living outside of the community where the land is situated, and certainly not to a purchaser who was living in a town five miles distant from the land.

APPEAL from Clatsop: THOS. A. McBRIDE, Judge.

This suit was instituted by George William Raymond against George Flavel for the purpose of having defendant declared a trustee of certain real property, described as the south half of the donation land claim of William W. Raymond and wife, being claim number forty-four, notification number seven thousand nine hundred and twenty-six, in township eight north, range ten west of the Willamette Meridian, in Clatsop County, Oregon. George Flavel having died, the suit was continued against his ex-

* The effect of a quitclaim deed in an otherwise perfect record title is considered in a note to the South Dakota case of *Parker* v. *Randolph*, 29 L. R. A. 33, showing what is called the "Iowa Doctrine," together with the holding of the United States Supreme Court, and when quitclaim purchasers are not protected against latent equities. See also a note on the rights of purchasers under quitclaim deeds with the Missouri case of *Eoff* v. *Irvine*, 32 Am. St. Rep. 614.— REPORTER.

ecutors. It is alleged that on December seventh, eighteen hundred and fifty-nine, William W. Raymond being then the owner of said premises, and the same having been sold under execution at sheriff's sale, and the time for redemption being about to expire, borrowed of one John Adair two hundred dollars, with which to satisfy said execution; that for the purpose of securing Adair in the repayment thereof Raymond executed to him a deed of general warranty for the premises, but that in fact said deed was intended as a mortgage, and that Adair never went into possession under said instrument; that Raymond paid off the loan in eighteen hundred and sixty-two, but that in consequence of mutual dealings and confidence no reconveyance was ever made; that on November twentieth, eighteen hundred and seventy-three, Adair executed in favor of Raymond's daughter, Martha A. Loomis, a deed of conveyance for said premises, to be held by her upon the same terms and conditions attached to the conveyance to him, but without any clause for possession, and without any warranty, except "against the lawful claims and demands of all persons whomsoever claiming by, through, or under" him, and that Martha A. Loomis took with full knowledge of the facts, and upon the same trust under which Adair held; that possession of said land was not taken until February third, eighteen hundred and eighty-six, when defendant entered; that on said third day of February, eighteen hundred and eighty-six, Martha A. Loomis and John Loomis, her husband, without the consent or knowledge of Raymond, sold and by deed conveyed the premises to defendant. It is further alleged that at the time of purchasing said land and prior thereto defendant had notice of Raymond's rights therein; that defendant was informed by George W. Raymond, the son of William W. Raymond, "that said land was his father's property, and that the said Loomis and wife had

no right to sell the same; that said Loomis had not paid for his mother's half, and had stolen the title to his father's half from Adair"; that at the time of said last-named conveyance and for twelve years prior thereto William W. Raymond was aged and decrepit, and incapacitated for business, which the defendant well knew; that defendant and William W. Raymond have resided in Clatsop County since long prior to December seventh, eighteen hundred and fifty-nine, and ever since and up to February third, eighteen hundred and eighty-six; that they were well acquainted, and lived within four miles of each other in the same community; that up to eighteen hundred and seventy-five there were but few residents in the community, and all were familiar with the affairs of each other; that Moses Rogers, the purchaser of the land at sheriff's sale, was the brother-in-law of defendant, and that defendant was fully aware of said sale and redemption, and of the execution of said deed to Adair, and knew that Adair had no claim to the real ownership of the premises; and that all said facts as to the title were matters of common reputation in the community, and that defendant had knowledge thereof. And further that since February third, eighteen hundred and eighty-six, defendant has been in the adverse possession of the premises; that the value of the use and occupation thereof for six years is two thousand dollars per annum, and that since the last named date William W. Raymond has sold and conveyed to plaintiff all his right, title, and interest in said premises.

The defendant, after denying all the material allegations of the complaint, except the execution of the several deeds, the relationship of Moses Rogers, and the adverse possession of defendant for the six years last past, set up other and further and separate answers under which the following defenses are claimed: *First,* that

the defendant is a purchaser in good faith, for value, and without notice of the alleged equities of plaintiff; *second,* that plaintiff's suit is barred by the statute of limitations; and, *third,* that plaintiff's claim is stale, and equity will not now interfere to grant relief, for the reason that plaintiff has been guilty of gross laches in prosecuting the same, and prays a decree that he is the owner in fee of said premises and that his title be quieted.

Trial was had before the court, and the following are its

### FINDINGS OF FACT.

"(1.) That on the seventh day of December, eighteen hundred and fifty-nine, and prior thereto, one William W. Raymond, as donee under the act of the congress of the United States commonly called the 'Donation Act,' was the owner in fee simple and in possession of the south half of the donation land claim of said William W. Raymond and his wife Almira Raymond, situated in Clatsop County, State of Oregon, being claim number forty-four, and notification number seven thousand nine hundred and twenty-six, and being parts of sections nine and sixteen in township number eight north, of range number ten west of the Willamette Meridian. (2.) That on the seventh day of September, eighteen hundred and fifty-nine, the said William W. Raymond, being indebted to one John Adair in the sum of two hundred dollars, in order to secure the payment of the same, granted, bargained, sold, and conveyed the said south half of the said donation land claim to the said John Adair, by a deed absolute on its face and in form, and by its terms a general warranty deed executed and acknowledged, and the said deed of conveyance was, on the twenty-first day of January, eighteen hundred and sixty, duly filed for record, and recorded in the office of the county clerk of said Clatsop County, at page 393 of book B, Record of Deeds, for said county of Clatsop, and

has ever since been so of record. (3.) That at the time said conveyance of said premises was made by said Wm. W. Raymond to said John Adair, it was understood and agreed between them that when said Raymond should pay the said John Adair the said sum of two hundred dollars and interest, he, the said John Adair, would convey to him the said premises, or would convey the same to any member of his. said Raymond's, family, that he, said Raymond, might request him to. (4.) That thereafter, on the twentieth day of November, eighteen hundred and seventy-three, the said John Adair still held the title to the said south half of said donation land claim under the conveyance to him aforesaid, and on said day, in consideration of the sum of two hundred dollars to him paid by one John Loomis and Martha A. Loomis his wife, granted, bargained, sold, and conveyed the said south half of said donation land claim unto the said Martha A. Loomis, by a deed duly executed and acknowledged, and she, the said Martha A. Loomis, immediately went into possession thereof, and of the whole thereof, claiming to own the same, and did occupy the same, and the whole thereof, openly, notoriously, and adversely to the claim of the plaintiff and of the said William W. Raymond and of all other persons, from the said twentieth day of November, eighteen hundred and seventy-three, up to the date that she and her said husband conveyed the same to the defendant, to wit, the third day of November, eighteen hundred and eighty-six. (5.) That at the time the said Martha A. Loomis purchased the said premises as aforesaid, she had notice of the claim of the said William W. Raymond, but she denied the same, and held the said premises adversely as aforesaid. (6.) That the said deed of conveyance from the said John Adair to said Martha A. Loomis was, on the twentieth day of November, eighteen hundred and seventy-three, duly filed for

27 OR.— 29.

record, and recorded at page 798 of book C, Record of
Deeds, for the said county of Clatsop.   (7.)   That there-
after, on the third day of November, eighteen hundred
and eighty-six, the said Martha A. Loomis and her said
husband John Loomis, in consideration of the sum of nine
thousand dollars to them paid by the defendant George
Flavel, granted, bargained, sold, and conveyed to the said
defendant George Flavel, and to his heirs and assigns for-
ever, the whole of the said donation land claim of said
William W. Raymond and his wife Almira, above de-
scribed, including the said south half of said claim, by a
deed duly executed and acknowledged and in form a gen-
eral warranty deed, and the price so paid was the actual
value thereof at said time; and the said defendant there-
upon, and on the said third day of November, eighteen
hundred and eighty-six, went into the actual possession
of the whole of the said donation land claim, and con-
tinued from that date up to the commencement of this
suit to hold and occupy the same openly, notoriously, and
adversely to the claim of the plaintiff and said William
W. Raymond and all other persons, and said defendant,
after he so purchased the said premises, and prior to the
commencement of this suit and prior to receiving any no-
tice whatever of the claim of the said plaintiff or the
said William W. Raymond to the said south half of the
said claim or to any part thereof, made valuable and per-
manent improvements on the said south half of the said
claim, at an expense of and of the value of not less than
ten thousand dollars.   (8.)   That at the time the defend-
ant George Flavel purchased the said premises, namely,
on said third day of November, eighteen hundred and
eighty-six, he had not, nor had he at any time prior
thereto, any notice, knowledge, information, or belief
whatever that the said William W. Raymond claimed any
right, title, or interest whatever in or to said south half

of said donation land claim, or in or to any part thereof, or made any claim thereto, but he was a *bona fide* purchaser thereof, without any notice of any adverse claim. (9.)   That on the —— day of ——, eighteen hundred and ninety-two, the said William W. Raymond, by a deed executed and acknowledged in due form, granted, bargained, sold, and conveyed unto the plaintiff all his right, title, and interest in and to the said south half of said donation land claim.   (10.)   That the said William W. Raymond, from the time that the said Martha A. Loomis purchased the said premises and entered into the possession thereof as aforesaid, had notice of the fact that she had entered into possession thereof under the said deed from said John Adair to herself, and was occupying and possessing the same openly, notoriously, and adversely, and claiming to own the same as against him and all others, but he made no attempt at any time to recover the said premises or any part thereof, but he stated on the witness stand that he did not do so, as he did not want to have any trouble or litigation, and knew he would have to have trouble and litigation to recover the land from said Martha A. Loomis, (11.)   That there is no evidence that said William W. Raymond ever paid the claim of said John Adair, or ever had any settlement with him, or ever endeavored to secure a reconveyance of the premises."

The court further finds as

### CONCLUSIONS OF LAW.

"(1.)   That the claim of the plaintiff and his grantor William W. Raymond to the said south half of the donation land claim of William W. Raymond and his wife Almira Raymond, above described, is barred by the statute of limitations, and that by reason thereof the plaintiff has no right, title, or interest or claim thereto, or in or to any part thereof.   (2.)   That whatever equity or right the

said William W. Raymond or the plaintiff through him ever had, is by lapse of time become stale, and it would be inequitable to recognize or permit the same to be asserted at this date, and for that reason the plaintiff is not entitled to recover in this suit.   (3.)   That the defendant, George Flavel, was and is a *bona fide* purchaser without notice of any adverse claim of the said premises in controversy, and for that reason the plaintiff is not entitled to recover in this suit.   (4.)   That the defendant is the owner in fee simple of the premises in controversy, and that the plaintiff's complaint herein should be dismissed, and defendant should have a decree quieting his title to the said premises as against said plaintiff, and for his costs and disbursements."

On July twenty-seventh, eighteen hundred and ninety-two, before any testimony was taken in the case, the plaintiff filed a motion asking the court to frame issues of fact (1) as to whether at the time of or prior to the conveyance from Martha A. Loomis and John Loomis to the defendant, he, defendant, had any notice or knowledge of the rights of William W. Raymond in the premises, or of any facts or circumstances sufficient to put a reasonable man upon inquiry; and (2) whether the statute of limitations had run against the rights of plaintiff,— and that a jury be called to inquire of the same.   This motion was overruled by order of the court, which order is assigned as error.   The conveyances from William W. Raymond to John Adair, and from Martha A. Loomis and husband to George Flavel, are in the ordinary form of deeds, containing the usual covenants of warranty.   The deed from John Adair and wife to Martha A. Loomis is as follows: "Know all men by these presents, that we, John Adair and Mary Ann Adair his wife, in consideration of six hundred dollars to us paid by Martha A. Loomis, do hereby bargain, sell, and convey to said Martha A. Loomis, and to her

heirs and assigns forever, the following described parcel of real estate, * * * together with the tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining; and also all our estate, right, title, and interest at law, and in equity therein or thereto, including dower or claim of dower; to have and to hold the same to the said Martha A. Loomis and to her heirs and assigns forever. And we do covenant with the said Martha A. Loomis and her legal representatives forever that the said real estate is free from all encumbrances, and that we will, and our heirs, executors, and administrators shall, warrant and defend the same to the said Martha A. Loomis, and to her heirs and assigns forever, against the lawful claims and demands of all persons whatever claiming by, through, or under us." Other evidence, sufficient for a full understanding of the points decided, will appear in the opinion. The decree was for defendant, and plaintiff appeals.

AFFIRMED.

For appellant there was a brief by *Messrs. Sidney Dell,* and *Whalley, Strahan and Pipes,* and an oral argument by *Mr. Dell.*

For respondents there was a brief by *Messrs. Fulton Brothers,* and an oral argument by *Messrs. William P. Lord* and *Charles W. Fulton.*

Opinion by MR. JUSTICE WOLVERTON.

1. The important questions involved in this case have been presented upon both sides with great force and rare ability, and received our careful attention. It is stoutly contended by appellant that the refusal of the court below to award an issue, and direct a jury to be formed to try certain questions of fact, was reversible error. The

basis for the contention is that the evidence is conflicting and doubtful, and, while it is admitted that the awarding of an issue lies in the discretion of the court, yet it is claimed that it is a judicial discretion, and subject to review by this court. It is further claimed that this is a right guaranteed by the state constitution, and prescribed by statute. Article I, section 17, constitution of Oregon, provides that "In all civil cases the right of trial by jury shall remain inviolate." This section simply secures to suitors the right of trial by jury in all cases where it was demandable at common law. It is not an enlargement, but a guarantee, of the right as it existed before the adoption of the constitution.* It applies to equitable suits to the extent only that in whatever instances a jury was demandable as of right at common law, it is demandable now under the constitution, but the class of cases formerly determined by the court alone is not affected by it: *Tribou* v. *Strowbridge,* 7 Or. 156; *Davis* v. *Dyer,* 62 N. H. 235, 237; *Le Guen* v. *Gouverneur,* 1 Johns. Cas. 500 (1 Am. Dec. 121).

2. By section 396, Hill's Code, it is provided that in suits in equity "Both issues of law and of fact shall be tried by the court, unless referred. Whenever it becomes necessary or proper to inquire of any fact by the verdict of a jury, the court may direct a statement thereof, and that a jury be formed to inquire of the same. The statement shall be tried as an issue of fact in an action, and the verdict may be read as evidence on the trial of the suit." This section is declaratory of the common-law equitable procedure in the manner of trial, and of the necessity and propriety of calling a jury for the determination of certain issuable facts; and hence we must look to the law as it stood before the constitution and the

---

* This was the holding in *Fleischner* v. *Citizens' Investment Company,* 25 Or. 119, following the Tribou case.—REPORTER.

statute to ascertain in what instances, under what circum-
stances, and for the determination of what issues, a com-
mission will issue for the interposition of a jury.    It was
the privilege of an heir at law, and of a rector or vicar,
in suits to establish a will or modus, to demand a hearing
before a jury, and this was granted as a matter of right.
Aside from these exceptions, the granting of an issue at
common law was discretionary with the court; it was not
demandable as of right: Adams on Equity, *377; 2 Daniel
on Chancery Practice, § 1080; *Barton* v. *Barbour,* 104 U. S.
133; *Pacific Railway Company* v. *Wade,* 91 Cal. 456 (25 Am. St.
Rep. 201, 13 L. R. A. 754, 27 Pac. 768); *Koons* v. *Blanton,*
129 Ind. 393 (27 N. E. 334); *Brown* v. *Buck,* 75 Mich. 274
(5 L. R. A. 226, 42 N. W. 827, 13 Am. St. Rep. 438).    For-
merly an issue was directed only in cases where there was
a want of evidence, or wherein the testimony was con-
tradictory, or so nearly balanced that it was necessary to
have an open and rigid cross-examination of the witnesses
where they could be seen and heard by the jury, who were
to decide the questions of fact submitted to them.    The
awarding of an issue was merely a matter of discretion rest-
ing with the chancellor, and its purpose was to inform his
conscience: *Clark* v. *First Congregational Society,* 45 N. H. 336;
*Townsend* v. *Graves,* 3 Paige on Chancery, 456; 2 Daniel on
Chancery Practice, *1078; *State* v. *Churchill,* 48 Ark. 436
(3 S. W. 352, 800).    But in all cases where there was
sufficient evidence to satisfy the conscience of the chan-
cellor, or where the evidence, though somewhat conflict-
ing and contradictory, unless it created a doubt in his
mind, by reason whereof he was unable to come to a sat-
isfactory conclusion of his own, an issue was not directed:
*Reed* v. *Cline's Heirs,* 9 Gratt. 136; *Le Guen* v. *Gouverneur,* 1
Johns. Cas. 500 (1 Am. Dec. 121); *Newark and New York
Railroad Company* v. *Mayor of Newark,* 23 N. J. Eq. 515; *Hard-
ing* v. *Handy,* 24 U. S. (11 Wheat.), 125; 2 Daniel on Chan-

cery Practice, *1072–3; *Beaumont* v. *Bramley,* 1 Turn. and R. 55. The propriety of granting or refusing an issue for a jury is always spoken of in the books as being a matter resting within the sound discretion of the court. Its exercise is judicial in its nature, and was at common law subject to appeal. BEASLEY, C. J., in *Newark and New York Railroad Company* v. *Mayor of Newark,* 23 N. J. Eq. 515, says: "The course of this practice has been uniform, and its propriety has never been, so far as I can learn, judicially criticised or questioned." The doctrine is recognized and stated by Mr. Daniel, (2 Daniel on Chancery Practice, *1075,) as follows: "Except in cases of an heir-at-law, or of a rector or vicar, who were entitled to issues as a matter of right, the granting of an issue by a court of equity was entirely a matter of discretion in the court, which it would not, however, exercise without due deliberation, and a mistake in the exercise of which was a just ground of appeal; and, therefore, if the court refused an issue, and the court of appeals thought the contrary decision would have been a sounder exercise of discretion, it would rectify the order of the court below accordingly; and so, when the house of lords thought that the court below had directed issues improperly, it reversed the order directing the issues, and remitted the cause with directions to the judge to decide upon the matter himself."

Lord Chancellor ELDON, in *Hampson* v. *Hampson,* 3 Ves. and B. Ch. 42, says: "Courts of equity have an original jurisdiction, which, I agree, must be exercised according to a sound discretion, to try questions of fact without the intervention of a jury; and which aid is sought, according to the common expression, for the purpose of informing the conscience of the court. I agree that a mistake in refusing to send the case to a jury is a just ground of appeal, if the court of appeal should think that the con-

trary decision would have been a sounder exercise of discretion; but it is a competent exercise of the authority and duty of the court, in every case, and throughout every case, and in every stage, to determine, according to its discretion, whether it does or not want that assistance." This doctrine has been recognized and the practice followed in this country. RADCLIFF, J., in *Le Guen* v. *Gouverneur,* 1 Johns. Cas. 500, (1 Am. Dec. 121,) says: "The chancellor is, constitutionally, the judge both of law and fact. Whether the institution of such a court be expedient or wise is not now the subject of inquiry. Its power is established, and the trial by jury is there unknown. However excellent that mode of trial may be, it is not the right of any party seeking his remedy in that court to demand it. It ought regularly to proceed from the chancellor himself, to inform his own conscience, where the evidence is insufficient for that purpose; and even with respect to him, it is not a power to be exercised at pleasure, and depending on arbitrary discretion." See also *Chase* v. *Winans,* 59 Md. 479. So that at common law, in cases of equitable cognizance, where the evidence was so conflicting and contradictory as to render the true state of affairs doubtful and uncertain, a jury was not demandable by either party as of right. It was a matter residing within the sound discretion of the court whether an issue for a jury should be awarded. This was a legal discretion, not to be arbitrarily exercised, and was the subject of review by the appellate courts. And under our statute cited above, (section 396, Hill's Code,) this doctrine must govern as to suits in equity in this state. It is the abuse of discretion that is reviewable, that it may not be arbitrarily exercised. The language of the statute is that "whenever it becomes necessary or proper to inquire of a fact by the verdict of a jury the court may direct a statement," etc. It is in many instances proper to call a jury when it

27 OR.— 30.

is not necessary or legally essential to do so. It is legally essential only when the law requires it. Such being the state of the law, it remains for us to determine whether there was an abuse of discretion by the court below in not directing a statement for a jury upon the two questions, one of notice, and the other of the statute of limitations. It may be doubted whether plaintiff's motion for a statement was made at the proper time (see *Chase* v. *Winans*, 59 Md. 479), but our views as to other aspects of the case render this question unimportant. We have very carefully read and considered all the voluminous testimony brought here, and have given especial attention to the portions thereof bearing upon the question of notice and the statute of limitations; and, while there is some conflict in the statements of the witnesses, we are left in no appreciable doubt as to the correctness of the findings of the court below. Without restating or discussing the evidence here, let it suffice to say we are fully satisfied that the presiding judge, exercising his functions as a chancellor in a case of purely equitable cognizance like this, did not arbitrarily refuse the plaintiff's request for a jury, and hence there was no abuse of discretion in such refusal.

3. But even if it were otherwise, this case would not be sent back for the purpose of having it go to a jury, for the very cogent reason that we have elsewhere determined that plaintiff is pursuing a stale demand, which is a question of law, and not of fact for a jury, and it could make no kind of difference how a jury should find upon the question sought to be submitted to their consideration: *Newark and New York Railroad Company* v. *Mayor of Newark*, 23 N. J. Eq. 515.

4. It is doubtless true that, as a general proposition, express or continuing trusts, clearly established, do not come within the statute of limitations, for the reason, as

stated by Lord REDESDALE (*Hovendon* v. *Annesley,* 2 Sch. and Lef. 607): "If a trustee is in possession, and does not execute his trust, and if the only circumstance is that he does not perform his trust, his possession operates nothing as a bar, because his possession is according to his title"; or, as put by STRAHAN, C. J., in *Manaudas* v. *Mann,* 22 Or. 525 (30 Pac. 422): "The trustee holds in right of the *cestui que trust,* and   *   *   *   as long as he holds in that right his possession cannot be hostile or adverse."   Mr. Wood in his work on Limitations (Vol. II, § 200), says: "This doctrine rests upon the case of *Cholmondeley* v. *Clinton,* 2 Jac. and W. 171,   *   *   *   and has been universally adopted in the courts of this country, as well as in England, ever since."   See also Perry on Trusts, § 863; *Decouche* v. *Savotier,* 3 Johns. Ch. 214 (8 Am. Dec. 478); *Seymour* v. *Freer,* 75 U. S. (8 Wall.), 202.   "But," says Mr. Justice GRAY, in *Speidel* v. *Henrici,* 120 U. S. 386, (7 Sup. Ct. 610,) "this rule is, in accordance with the reason on which it is founded, and as has been clearly pointed out by Chancellor Kent and Mr. Justice Story, subject to this qualification, that time begins to run against a trust as soon as it is openly disavowed by the trustee insisting upon an adverse right and interest which is clearly and unequivocally made known to the *cestui que trust;* as when, for instance, such transactions take place between the trustee and the *cestui que trust* as would in case of tenants in common amount to an ouster of one of them by the other."   See also Perry on Trusts, § 864; *Bacon* v. *Rives,* 106 U. S. 99, 107 (1 Sup. Ct. 3); *Phillippi* v. *Phillippi,* 115 U. S. 151 (5 Sup. Ct. 1181); *Otto* v. *Schlapkahl,* 57 Iowa, 226 (10 N. W. 651); *Janes* v. *Throchmorton,* 57 Cal. 388; *Hastie* v. *Aiken,* 67 Ala. 316; *Hubbell* v. *Medbury,* 53 N. Y. 98; *Ward* v. *Harvey,* 111 Ind. 471 (12 N. E. 399); *Decouche* v. *Savotier*, 3 Johns. Ch. 214 (8 Am. Dec. 478).   It thus appears that where the trustee disavows his trust, and assumes com-

plete ownership of the trust property, and treats it in such a manner and under circumstances as to give the *cestui que trust* actual or constructive notice that he has repudiated all trust relations, the statute attaches, and begins to run as against the *cestui que trust* from that time, unless he is then under some statutory disability, or under influences superinduced by the trustee. Such a denial of the trust relations, and the assertion of an adverse or hostile claim by the trustee, is an abandonment of the fiduciary character in which he theretofore stood as to the property, and from the time that it is made to appear clearly that the *cestui que trust* had knowledge, either directly or indirectly by necessary implication, of the repudiation or adverse and hostile claim of the trustee, the statute begins to run, and if it continues for the statutory period the *cestui que trust* is barred: 2 Wood on Limitations, § 212.

*Ward* v. *Harvey,* 111 Ind. 471, (12 N. E. 399,) was a case where it was sought to charge the administrator with funds which he had received from the sale of lands of which his intestate held the title. It was contended by appellants that they had furnished part of the purchase money, and that a trust resulted in their favor. The court there say: "Conceding that when the land was acquired and title taken, as it was, by John Ward, in eighteen hundred and fifty, and that it was taken in trust, there can be no recovery, because the evidence shows that more than twenty years prior to the time that this action was brought there was an open disavowal of the trust. The evidence, indeed, shows more than a disavowal of the trust, for it shows that the appellants acquiesced in the intestate's assertion of title. There is evidence very clearly showing that the intestate treated the land as his own, and that the appellants dealt with him as the owner. Under this evidence there can be no recovery; for it is

well settled that where there is a disavowal of the trust, and it is brought to the notice of the beneficiary, the statute will run." *Hubbell* v. *Medbury,* 53 N. Y. 98, is a case where the trustee bought in, at a foreclosure sale, lands held in trust by him, and it was held that the statute began to run as soon as the trustee took possession in pursuance of the foreclosure sale, and "began openly and notoriously to occupy them as his own, asserting an individual right thereto." *Philippi* v. *Philippe,* 115 U. S. 151, (5 Sup. Ct. 1181,) is much in point. The question came up on demurrer to a bill showing that Antonio Philippe claimed as his own since eighteen hundred and fifty-six the property alleged to have been bought with partnership or trust funds, the knowledge of which was brought home to Angelo M. Philippi, the ancestor of plaintiff, but that from the year eighteen hundred and fifty-six down to the death of Angelo in eighteen hundred and seventy-four, eighteen years, and down to the commencement of the suit in eighteen hundred and seventy-nine, a period of twenty-three years, defendant had maintained his possession, and used and enjoyed as his own the property and its issues and profits. During all the period up to his death Angelo lived in the same town with defendant, in poverty, and some of the time in distress for want of means, but that defendant never paid to Angelo any part of the proceeds of the large property which the bill avers he was holding in trust. The court say: "There could be no clearer line of conduct on the part of Antonio Philippe to show his repudiation of the alleged trust, and his claim of title to the alleged trust property; and all was of necessity known by Angelo." The statute of limitations in Alabama, where the cause of suit arose, was twenty years, and it was held that the plaintiff's suit was barred. In this state, by section 382, Hill's Code, a suit for the determination of any right or claim to or interest in real

property shall be deemed within the limitations provided for actions for the recovery of the possession of real property. Under this statute it has been held that the same period which will bar an action for the recovery of real property will bar a suit touching a claim or interest therein, which is ten years: *Springer* v. *Young,* 14 Or. 285 (12 Pac. 400). So that a clear disavowal by the trustee of the trust relation, and an adverse or hostile holding of real property, for a period of ten years, the *cestui que trust* having had notice and knowledge thereof during the entire time, will bar a right of recovery by the *cestui que trust* under our statute.

5. It is further urged as an objection to plaintiff's recovery in this suit that his claim is stale, and that, aside from the statute of limitations, a court of equity should not lend its aid at this time by granting the relief demanded. In order to call into activity a court of equity there must be an exercise of good conscience, good faith, and a reasonable diligence; and where time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties, or other circumstances, give rise to presumptions unfavorable to its continuance, the court is passive and does nothing, because of its inability to do complete justice: 2 Wood on Limitations, § 214; *Taylor* v. *Blair,* 14 Mo. *437; *Williams* v. *First Presbyterian Society,* 1 Ohio St. 494, and *Badger* v. *Badger,* 69 U. S. (2 Wall.), 94. Both or either of these objections based upon the lapse of time are fatal to plaintiff's cause of suit. On December seventh, eighteen hundred and fifty-nine, Gen. John Adair loaned to W. W. Raymond, the father of plaintiff, two hundred dollars, to secure the payment of which Raymond executed and delivered to Adair a deed to the premises in question. So it is found by the court below, and is probably correct, although the evidence upon which it is based is somewhat obscure and unsatisfactory. On

November twentieth, eighteen hundred and seventy-three, nearly fourteen years thereafter, Adair executed and delivered a deed to the premises to Martha A. Loomis, the daughter of W. W. Raymond, for the consideration of six hundred dollars. Mrs. Loomis, with her husband, John Loomis, while living on a tract of land adjoining, took possession, and in about a year thereafter inclosed the same by a substantial inclosure. They continued in possession, making such use of the premises as it was capable of, until February second, eighteen hundred and eighty-six, more than thirteen years, when they sold and conveyed them by deed to the defendant, who took immediate possession, and occupied the same up to the date of the commencement of this suit, (July fifteenth, eighteen hundred and ninety-two,) so that more than thirty-two and a half years have elapsed since the transactions transpired by reason of which it is claimed the trust relations had their inception. Conceding that the deed to Adair was intended as a mortgage, he became by reason thereof a trustee of the legal title by express understanding between the parties. It is claimed that Mrs. Loomis took from Adair with the express understanding that she should assume the trust obligations of Adair, but this is not proven, although it is apparent that she had knowledge of such obligations. Mrs. Loomis, then, took with notice of the trust, and became a trustee *ex mala fide,* or by implication or construction of law, and it has often been held that the statute of limitations will run against a resulting trust. This, however, we do not now decide. Mrs. Loomis' holding began to be adverse and hostile to that of W. W. Raymond from the time she took possession, and so continued to the date of her transfer to defendant, who continued in the adverse possession to the date of the commencement of this suit. There was a repudiation and disavowal by Mrs. Loomis of all trust relations, and a claim of absolute title and

ownership by her, of which Raymond clearly had knowledge. "Where the trustee makes a conveyance of the trust property in breach of the trust, and his grantee continues to hold adversely, the statute applies": 2 Perry on Trusts, § 864. These facts make the statutory bar effectual.

Beyond this it appears that during all the thirty-two and a half years intervening from the time of the execution of the deed to Adair, W. W. Raymond lived in the immediate neighborhood, and part of the time with Mrs. Loomis, yet he never at any time asserted his alleged rights as a *cestui que trust*. Much of this time he lived in poverty, and upon the county and the charity of his neighbors. He himself testified that he did not broach the subject of settlement to his daughter or son-in-law for fear of disturbing the family relations of amity and friendship, and he certainly never did inform the defendant of his alleged claim. Nor is there a scintilla of testimony in the whole case to the effect that any of the grantees, from General Adair down, have practiced any fraud or deception upon him to prevent the enforcement of his demand, or to lull him into silence and repose. The relations of the parties have greatly changed; witnesses have died, the defendant has made valuable improvements upon the land, and the land itself has greatly enhanced in value, so that equity cannot now do complete justice as between the parties. Very similar were the facts attending the Philippi case, and were held to constitute unwarranted laches. And so in this case Raymond has been guilty of laches by reason of which his claim has become stale. A court of equity will not at this late date lend its aid to grant him or the plaintiff, who is his grantee, the relief demanded.

6. The question of notice, both actual and constructive, is involved in this inquiry. We have decided in a

late case, *Bowman* v. *Metzger,* 27 Or. 23, (39 Pac. 3,) wherein it was sought to charge a purchaser of a promissory note before due with notice of infirmities in the title, that the question for the determination of the jury was whether Bowman purchased in good or bad faith; and that it was error for the court to instruct the jury that notice of facts and circumstances that a prudent man would take notice of and inquire about, and which, if followed up, would disclose the truth, was equivalent to notice. The principle is applicable here. Circumstances which one man might look upon with suspicion, and which might cause him to make careful inquiry, might escape the notice of another person of equal prudence and caution; so that the incidental question of common prudence is not a safe criterion by which to determine a question of notice. It might be and often is a circumstance tending to show bad faith, as fraud or guilty knowledge may be imputed either by direct proof, or evidence of a circumstantial nature, the same as any other fact, but the real and ultimate question for determination is the *mala fides* of the transaction. If a person has actual notice of latent equities, and purchases notwithstanding, the presumption of *mala fides* is irresistible, or rather he takes the estate laden with the equities, and stands in no better position than his grantor. The attempt to claim as an innocent purchaser is the fraud of which the owner of the equitable title may complain.

7. The deed from John Adair to Mrs. Martha A. Loomis, the defendant's immediate grantor, is a bargain and sale deed with special covenants of warranty against the grantor's own acts. It is claimed that the effect of this deed, it appearing in defendant's chain of title, is to impute actual notice of outstanding equities. The doctrine contended for is that "the absence of the usual covenants of warranty of title in the conveyance to his

immediate grantor is a warning of an outstanding equity
to the purchaser, who has actual notice of such defect;
and the burden of proof is on such purchaser to show
consequent careful inquiry in good faith, and the receipt
of a satisfactory explanation for such a defect. Other-
wise he will be held to have actual notice of the equity."
Many authorities hold to the doctrine that one taking and
holding directly under a quitclaim deed cannot be con-
sidered a *bona fide* purchaser without notice of prior equi-
ties. Some hold that the legal effect of a quitclaim deed
found in the chain of title is such as to impute notice
to the purchaser. Such is the purport of the opinion of
Mr. Justice THAYER, in which the other justices did not
occur, in *Baker* v. *Woodward,* 12 Or. 3 (6 Pac. 173). The doc-
trine has since been restated in *American Mortgage Company* v.
*Hutchinson,* 19 Or. 334, (24 Pac. 515,) and alluded to in *Low* v.
*Schaffer,* 24 Or. 239 (33 Pac. 678). Other authorities sus-
tain the position that one who purchases from another
holding under a quitclaim deed cannot, by reason of that
fact, claim to be a purchaser without notice, as limited
and qualified by MCIVER, J., in *Aultman* v. *Utsey,* 34 S. C. 572
(13 S. E. 848). He says: "While we are not prepared at
present to go to the full extent to which the doctrine has
been carried by some of the cases, yet we are satisfied
that the fact that the immediate grantor of the purchaser
holds under a quitclaim deed is a circumstance well cal-
culated to excite inquiry, which, if not pursued properly,
will affect the purchaser with notice of every fact which
such inquiry, pursued with due diligence, will disclose."
From this case, and the case of *Merrill* v. *Hutchinson,* 45
Kan. 62, (25 Pac. 215,) comes the doctrine of "warning,"
which the counsel for appellant so strenuously insists is
applicable here. The latter case is one wherein the pur-
chaser, Hutchinson, took under a quitclaim. The court
say: "The form of the deed alone did not conclude Hutch

inson, nor prevent him from becoming a purchaser in good faith; it simply operated as a warning to him, and put him upon inquiry. It was his duty then to look further, and ascertain why the deed was made without covenants of warranty; and he took it loaded with such outstanding equities or interests as he might have discovered by the exercise of reasonable diligence." But in whatsoever of these several phases this doctrine may have been announced, limited, and qualified, it is severely criticised and very much shaken by the strong and forcible reasoning and logic of Justices FIELD and BREWER in the cases of *Moelle* v. *Sherwood,* and *United States* v. *California Land Company,* 148 U. S., at pages 21 and 31 (13 Sup. Ct. 426, 458). The doctrine of those cases is that "the receipt of a quitclaim does not of itself prevent a party from becoming a *bona fide* holder, and the doctrine expressed in many cases that the grantee in such a deed cannot be treated as a *bona fide* purchaser, does not rest upon any sound principle." But we are not called upon here to declare the *bona fides* of a purchaser, whether holding under a quitclaim, or taking from one so holding, or taking upon finding a quitclaim in the chain of his title. The defendant took under a deed with full covenants of warranty, and his immediate grantor under a deed of bargain and sale with special covenants of warranty against the acts of the grantor. The latter deed, as well as the former, binds and passes every estate or interest which the grantor may subsequently acquire: *Taggart* v. *Risely,* 4 Or. 235; *United States* v. *California Land Company,* 148 U. S. 31 (13 Sup. Ct. 458). A deed of this nature purports to pass the whole estate, and the fact that it contains a limited warranty, or if it contains no warranty at all, cannot of itself impute notice of prior or latent equities, nor will it operate as a warning to put the purchaser upon

inquiry at his peril. No presumption of the want of *bona fides* in the purchaser is thus cast upon him, as the warranty forms no part of the conveyance, and a perfect title passes without it: *Taylor* v. *Harrison,* 47 Texas, 460 (26 Am. Rep. 304); *Richardson* v. *Levi,* 67 Texas, 363 (3 S. W. 444); *Garrett* v. *Christopher,* 74 Texas, 453 (15 Am. St. Rep. 850, 12 S. W. 67); *Snowden* v. *Tyler,* 21 Neb. 215 (31 N. W. 661); *Meikel* v. *Borders,* 129 Ind. 533 (29 N. E. 29); *Chapman* v. *Sims,* 53 Miss. 163, and *Moelle* v. *Sherwood,* 148 U. S. 31 (13 Sup. Ct. 458). We have been cited to no authority holding that the doctrine contended for by the counsel for appellant is applicable to a deed of bargain and sale, such as we find in this record, and we believe none can be found.

8. It is next contended that defendant had at the time of his purchase actual notice of the equities of plaintiff's grantor. This is a question of fact to be determined from the evidence. The testimony which it is claimed shows that Flavel had actual notice of W. W. Raymond's outstanding equity at the time of his purchase is as follows, as collated in the brief of counsel for appellant: John B. Morris testifies: "In January, eighteen hundred and eighty-six, Captain Flavel and McGuire came there (to Tanzy Point) * * *. Captain asked me, 'Jack, do you know what my errand is?' and says, 'I am bargaining with Loomis about this place, but he says he would have nothing to do with it till we had fixed up things, because he heard I had a claim on the place.' * * * 'But,' says I, 'Captain Flavel, if you purchase his place, I am very much afraid you will have trouble with the Raymond folks some time or another,' and he didn't seem to take any heed of it at all. I told him that after I got outside, under a little willow tree near a cabin." G. W. Raymond testifies: "Late in eighteen hundred and eighty-five I heard that Loomis was offering to sell the Raymond donation land claim to George Flavel. A short time be-

fore the deed I went to see Flavel. * * * I told Captain Flavel that Loomis had no rights there. It was down here on the street by the Occidental Hotel." Again he says: "I told him (McGuire) not to have anything to do with it; that Loomis had no rights there; that he had bought mother's half and never paid for it, and was trying to steal the old man's altogether." Let it be assumed that McGuire was the agent of Flavel,—the evidence shows, however, that he was not,—and let it be further assumed that this conversation took place shortly prior to the execution and delivery of the deed by Loomis to Flavel. Is there enough in all this to charge Flavel with notice or to superinduce inquiry, without which he could not complete the purchase with a conscience void of offense? The purchaser must have received information of facts tangible in their nature, and such as are capable of being verified by reasonable inquiry; vague rumors and covert insinuations will not suffice. The reason is that such rumors and statements do not furnish any positive information, any tangible clew, by the aid of which he may commence and successfully pursue an inquiry, and thus discover the real truth. Such rumors and insinuations therefore do not bind the conscience: 2 Pomeroy's Equity, §§ 597, 602; *Wilson* v. *McCullough*, 23 Pa. St. 440 (62 Am. Dec. 347).

Morris testifies that he said to Flavel, "If you purchase this place I am very much afraid you will have trouble with the Raymond folks some time or another." And George Raymond states at one time "I told Captain Flavel that Loomis had no rights there," and McGuire at another, "not to have anything to do with it, that Loomis had no rights there, but he had bought mother's half and never paid for it, and was trying to steal the old man's altogether." Now, at the time of the purchase by defendant it is claimed that Mrs. Loomis was a trustee in

regard to the title, and W. W. Raymond the *cestui que trust,*
and that the deed under which Mrs. Loomis held the title
was in reality a mortgage to secure a loan of long stand-
ing, the defeasance resting in parol.   What is there in
either of these assertions to afford Flavel a clew to this
secret trust?   That he might have trouble with the Ray-
mond folk was possible, or might have been even proba-
ble, but it was not made apparent what fact would induce
the trouble.   And the assertion that Loomis had no rights
there was surely not suggestive of a secret trust abiding
in Mrs. Loomis for the benefit of Raymond.   Nor was the
assertion "that Loomis had no rights there," coupled
with the one "that he (Loomis) had bought mother's half
and never paid for it, and was trying to steal the old
man's altogether," any more explicit as the statement of
a fact which could be laid hold of, and which, when fol-
lowed up, would lead directly to the discovery of this
secret trust.   The language is strong to assert that one
person is trying to steal another's land, and one would
infer that an attempt was being made to commit a griev-
ous fraud.   But from such an expression, how is one go-
ing to find out of what the fraud consists?   It would be
fruitless to go to Loomis and inquire of him if he was
trying to steal the land, and it might well have been as-
sumed that George Raymond told him all he knew about
it.   So that, taking the testimony in its strongest light,
we find no suggestion of any fact of a tangible nature
which bears any indication whatever of the existence of
a secret trust connected with the deed, which was in effect
but a mortgage encumbering the land which Flavel was
about to buy.

A court of equity acts upon the conscience, and it is
upon the ground of *mala fides* that a purchaser for value is
affected with notice of a prior claim.   The notice must be
more than would excite the suspicion of a cautious and

wary person; it must be so clear and undoubted, with respect to the existence of a prior right, as to make it fraudulent in him afterwards to take and hold the property: *Hall* v. *Livingston,* 3 Del. Ch. 348. This case cites several others with facts very similar to the case at bar. It may be remarked, however, in passing, that the facts of these alleged warnings being given by the witnesses Morris and George Raymond to Flavel and McGuire is disputed by the latter, or at least to the extent of materially modifying and explaining their meaning and bearing. On the other hand it has been proved beyond question that Flavel paid nine thousand dollars in cash for the land and some forty head of cattle,— all that the land and cattle were worth; that before completing the purchase he took the precaution of having the record searched as to the land, and to procure the advice of an attorney skilled in such matters. He was also careful to see that a claim of John B. Morris against Loomis, which it was thought might encumber the land, was provided for before he would consummate the purchase. Flavel found Loomis in full possession of the land, acting as owner thereof, and he himself took possession directly from Loomis. In all this we are unable to discover that Flavel acted in bad faith in any particular, and the evidence fully warrants the position that he was a purchaser in good faith, for value, and without notice of the secret equities of W. W. Raymond.

9. Two other questions remain to be noticed: (1) as to the "burden of proof"; and (2) as to "common reputation." It is asserted that "upon proof of the equitable title of plaintiff, a defendant who relies upon the defense of being an innocent purchaser in good faith must set up the union of the legal title with a superior equity arising from the payment of the money and receiving the conveyance without notice, and with a clear conscience." This

doctrine seems to be based upon good authority. See *Rhodes* v. *McGarry,* 19 Or. 222 (23 Pac. 971), and *Boone* v. *Chiles,* 35 U. S. (10 Pet.), 211. But the defendant has done by his answer precisely what the rule requires, and the evidence offered supports it.

10. It is further claimed that the court below was in error in excluding evidence as to common reputation of ownership of this land at and during the time that General Adair held the deed thereto. The object of offering this proof was to charge Flavel with notice. The statute provides (section 776, subdivision 12, Hill's Code): "That a person is (presumed to be) the owner of property from exercising acts of ownership over it, or from common reputation of his ownership." This statement is an innovation upon the common law. Prior thereto it was incompetent to prove ownership by common reputation: *Wilson* v. *Maddock,* 5 Or. 480. It was also held in that case that "by this provision common reputation is placed on an equal footing with possession, as furnishing a presumption of ownership." Now, it is contended for this that, as possession is notice of ownership, common reputation of ownership serves the same purpose as to such notice. Whether this is so or not, reputation of ownership could hardly have the effect of giving notice to persons residing without the community in which the land was situated. It was shown that Captain Flavel lived at Astoria, then quite a village, some five or six miles from the land, and by reason of this fact he was not likely to have become cognizant of such reputation, even if it was common in the community in which the land is situated. There was no error in excluding the testimony. The decree of the court below will be affirmed.

                                              AFFIRMED.